[Civ. No. 13096. First Dist., Div. Two. May 2, 1947.]

JAMES MANNEY, SR., Respondent, v. HOUSING AUTHORITY OF THE CITY OF RICHMOND, Appellant.

NANCY WILLIAMS, Respondent, v. HOUSING AUTHORITY OF THE CITY OF RICHMOND, Appellant.

HENRY MANNEY, JR., a Minor, etc., Respondent, v. HOUSING AUTHORITY OF THE CITY OF RICHMOND, Appellant.

JOHN SHEPARD, Respondent, v. HOUSING AUTHORITY OF THE CITY OF RICHMOND, Appellant.

(Four Cases.)

454

Harold F. Sawallisch, Cooley, Crowley & Supple, Cooley, Crowley, Gaither & Dana and A. Dal Thomson for Appellant.

Clark & Heafey, Edwin A. Heafey, Carlson, Collins & Gordon, Robert V. Collins and Frederick Bold, Jr., for Respondents.

DOOLING, J.—These four cases were consolidated for trial and are here consolidated on appeal. Three of the actions are for wrongful death, and the fourth, that of Henry Manney, Jr., is for personal injuries. The decedents lost their lives in a fire which destroyed a dormitory for the housing of shipyard workers in the city of Richmond, California, and Henry Manney, Jr., received personal injuries in the same fire. The dormitory, known as Dormitory O, was one of 26 identical dormitories designated by letters A to Z. They were built by Farm Security Administration and transferred by that agency to the Federal Housing Authority, and by the latter leased to defendant and appellant, Housing Authority of the city of Richmond.

The actions were based upon the alleged negligence of defendant in maintaining in Dormitory O hot-air ducts of

wood or fiber composition which were alleged to be inflammable when subjected to excessive heat.

The dormitory was constructed of wood and plywood, two stories in height, with a central hall running the full length of each floor and rooms opening off the hallway on either side. The furnace which burned oil was located in a room near the center of the building on the ground floor. Cool air was drawn into the system by a fan which forced it, after it was heated, through the ducts to the rooms. The ducts were constructed of celotex, or a similar composition, and ran the full length of each floor as a part of the ceiling. Celotex is composed of cane fiber treated to raise its ignition or flash point and will only ignite at a temperature of approximately 500 degrees. There is evidence that its exposure to alternate heat and cold tends to reduce its flash point.

The witness Cooper, Chief of the Fire Department of the city of Richmond, testified that he had frequently warned the administrative officer of defendant of the fire hazard from these ducts as constructed in this group of 26 dormitories. Testifying as an expert Cooper expressed the opinion that dust and lint collected in the ducts had been ignited causing an explosion which in turn ignited the material of which the ducts were composed. He based this opinion upon his own observation of the burning building and the fact that when he arrived at the fire the entire length of the first floor ducts was blazing (''The base of the flames was the full length of the ducts''), and fragments of the ducts were hanging from the ceiling.

The jury returned verdicts for the plaintiffs in the four cases and from the judgments which followed defendant takes this appeal.

Appellant was created pursuant to the ''Housing Authorities Law'' (Stats. 1938, p. 9; 2 Deering's Gen Laws, Act 3483). It is given the power ''to sue and be sued.'' (§ 8, subd. (a).) In the operation of this dormitory it was engaged in a proprietary and not a governmental function. Any doubt which might have existed as to its liability to suit for negligence while acting in a proprietary capacity has been resolved in *People* v. *Superior Court*, 29 Cal.2d 754 [178 P.2d 1]. Cf. *Housing Authority of Birmingham Dist.* v. *Morris*, 244 Ala. 557 [14 So.2d 527, 535].

The basic attack upon the judgments is that they are without support in the evidence. This attack in turn depends

on the claim that the court erred in permitting Fire Chief Cooper to testify as an expert witness to his opinion as to the cause of the fire. It is appellant's position that expert evidence is not admissible as to the cause or origin of a fire. To support this contention appellant relies upon *St. Paul F. etc. Co.* v. *Southern Pac. Co.,* 30 Cal.App. 140 [157 P. 247]. In that case the fire chief of the city of Hollister had given testimony as an expert as to the cause of a fire. The court said at page 142:

"We are of the opinion that the court committed an error in permitting this witness to give his opinion as to the origin of this fire; and that the better reasoned line of authorities holds that the question as to the origin of a fire is not ordinarily one of expert opinion, but is a deduction which the court or jury is equally competent to draw from the visible facts presented in evidence."

Respondents counter by citing *Gallichotte* v. *California etc. Assn.,* 23 Cal.App.2d 570 [74 P.2d 73, 535]. In its opinion on denial of petition for rehearing in that case at page 581 the court said:

"Furthermore, it may be stated that in our opinion the ruling in the case of *St. Paul Fire & Marine Ins. Co.* v. *Southern Pac. Co.,* 30 Cal.App. 140 [157 P. 247], cited and relied on by the defendants, cannot be said to be controlling here for the reason that there the witness was called to testify purely as an expert, and the opinion he gave as to the origin of the fire in question there was based solely on a hypothetical case, that is, upon a state of circumstances established by the testimony of others; whereas here, as pointed out by the decision on the former appeal, the witness arrived at the scene of the fire while it was in full progress, and his opinion as to the origin of the fire was based entirely upon his own observation of the conditions existing upon his arrival."

Respondents insist that the net result of the opinions in these two cases is that an expert who has been present at a fire may give his opinion as to its cause or origin but that expert evidence upon that subject may not be given in answer to hypothetical questions by one who was not present at the fire and therefore had no opportunity personally to observe it. Since appellant produced an expert who was not present at the fire the apparent inequity and unfairness of the rule as thus stated is pointed up in this case. Furthermore, appellant states that an examination of the record in *St. Paul F.*

*etc. Co.* v. *Southern Pac. Co., supra,* 30 Cal.App. 140, shows that the witness in that case was present at the fire and based his opinion on what he there observed, and that the case is therefore not subject to any such distinction as that attempted in the opinion on denial of rehearing in *Gallichotte* v. *California etc. Assn., supra,* 23 Cal.App.2d 570.

While the St. Paul F. etc. Co. case was probably correctly decided on its facts we believe that the rule of evidence therein announced is too broadly stated. An examination of the authorities cited by the court in support of its statement "that the better reasoned line of authorities holds that the question as to the origin of a fire is not ordinarily one of expert opinion" shows that no one of such authorities dealt with the subject of expert evidence. They were all cases in which the opinions of nonexperts who had been present and observed the fires were sought to be introduced.

The growth of the rule excluding opinion evidence and the development of the two well recognized exceptions to the rule are learnedly traced by Dean Wigmore in 7 Wigmore on Evidence, third edition, pages 1 to 29. The two instances in which the opinions of witnesses are permitted in evidence are:

■ 1. The opinions of experts are admitted in matters which are not within the common experience of men so that the special knowledge of a person of skill and experience in the particular field may enable him to form an opinion, where men of common experience would not be able to do so. (Code Civ. Proc., § 1870, subd. 9; 10 Cal.Jur., Evidence, § 216, pp. 957-8; 7 Wigmore on Evidence, 3d ed., § 1923, pp. 21-22; Jones on Evidence, 3d ed., § 367, pp. 553-4; 1 Greenleaf on Evidence, 16th ed., § 441b, p. 550; 20 Am.Jur., Evidence, § 775, p. 647; 32 C.J.S., Evidence, § 444, p. 73, § 520, p. 217, § 523, p. 221.)

■ 2. The opinions of nonexpert witnesses are admitted as a matter of practical necessity when the matters which they have observed are too complex or too subtle to enable them accurately to convey them to court or jury in any other manner. (10 Cal.Jur., Evidence, § 236, pp. 978-980; 7 Wigmore on Evidence, 3d ed., § 1924, pp. 22-23; Jones on Evidence, 3d ed., § 360, p. 542 et seq.; 1 Greenleaf on Evidence, 16th ed., § 441(b), p. 550; 20 Am.Jur., Evidence, § 769, p. 540; 32 C.J.S., Evidence, § 444, p. 73, § 485, p. 144.)

For a nonexpert to be competent to give an opinion under the second exception he must be testifying about facts that he has personally observed; ■ but the expert in any case

proper for the reception of expert testimony may give his opinion, although he did not personally observe the facts, basing his opinion upon the facts testified to by other witnesses put to him in the form of hypothetical questions. (10 Cal. Jur., Evidence, § 222, p. 965.) The ultimate question to be determined in every case in which expert testimony is tendered is whether the case is one outside of the common experience of men so that a person of training and experience by reason of his superior knowledge is better able to reach a conclusion from the facts. If the case is one for expert testimony this is so not because the expert has witnessed the facts, but because he is qualified by reason of his special knowledge to form an opinion on the facts while the ordinary juror is not. It is a confusion of the two exceptions to the rule excluding opinion evidence to make the reception of expert testimony dependent upon the fact that the expert has been a personal witness to the facts.

██ Cases can be mustered to support the proposition that expert evidence is admissible to prove the cause of a fire. (See cases collected in the note in 131 A.L.R., p. 1124, col. 1.) Cases can be assembled to support the contrary proposition. (See cases collected in the same note at p. 1124, col. 2.) Such an approach is mechanical rather than logical. The cause of some fires may be so simple as to fall within the common experience of any juror. If that is true the evidence of experts is unnecessary to assist the jury. To give a simple illustration any juror knows from his own experience that the application of a lighted match to dry grass will cause a fire. The cause of other fires may be so foreign to the common experience of the ordinary juror that he cannot know without the aid of expert testimony whether a fire might be expected to result or not. For example whether the combination of two chemical products would result in combustion. In the latter case only the evidence of experienced and trained chemists might enable the jury to arrive at the correct conclusion. The matter was well put by Owen, J., in *Baltimore & O. R. Co.* v. *Schultz,* 43 Ohio St. 270 [1 N.E. 324 at p. 332, 54 Am.Rep. 805]:

"It must not be supposed that there is any rule of evidence concerning the opinions of witnesses which is peculiar to fences, highways, bridges, or steamboats, or to any other special subjects of investigation. Where the facts concerning their condition cannot be made palpable to the jurors so that their means of forming opinions are practically equal to those

of the witnesses, opinions of such witnesses may be received, accompanied by such facts supporting them as they may be able to place intelligently before the jury.''

Nor, may we add, should there be any rule of evidence concerning the opinions of witnesses which is peculiar to fire, flood or other catastrophe. The inquiry should not be is expert evidence admissible to prove the cause of fires generally, but rather is expert evidence admissible to prove the cause of this particular fire; and the answer to that question should depend on the answer to the further question: Is the matter involved one which is not within the common experience of men so that the special knowledge of a person of skill and experience in the particular field may ''enable him to draw an inference, where men of common experience, after all the facts proved, would be left in doubt.'' (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545, 571 [147 P. 238].)

It is our conclusion that the question whether this fire originated in the hot-air ducts is a matter outside the ordinary experience of men and that expert testimony was properly admissible upon the subject. We therefore hold that it was not error to admit the opinion of the witness Cooper.

Appellant complains that Cooper was permitted to express his opinion based partly on hearsay, which he gathered from persons not called as witnesses. It is true that during the laying of the foundation for his expert opinion the witness testified that he had conducted an investigation after the fire and that he had formed an opinion based partly upon what he had learned in that investigation; but before he gave his opinion he was admonished by the judge that his opinion must be based on his study and experience bringing them ''to focus on the conditions that you found there and not on what somebody else told you or what somebody else may have said was their opinion about the fire.'' That the witness obeyed this admonition seems clear from the fact that after giving his opinion he testified that it was based on ''the condition of the ducts and the fire at the time of my immediate arrival.''

It is further urged that in forming his opinion Cooper made certain unwarranted assumptions: 1. *That there was dust and lint in the ducts.* It is argued in this regard that the air leading to the furnace, which after being heated was forced through the ducts, was filtered through spun glass fil-

ters. There was evidence that the filters had a tendency to get clogged thus preventing the free flow of air through the heating system, and that in some of the dormitories (although there was no specific evidence as to Dormitory O) tenants had from time to time removed the filters entirely. There was further evidence that within sixty days after the fire, during the course of renovation, dust and lint were found in the hot-air ducts of other dormitories in the same group. It was a question for the jury whether dust and lint had accumulated in the hot-air ducts in Dormitory O.

■ 2. *That the heat in the ducts had risen to 200 degrees.* It is argued that the furnace which supplied the heat through the ducts was controlled (a) by a thermostat in the lobby which was set at 72 degrees and locked, (b) by a thermostat on the furnace itself which would automatically shut off the furnace when the top of the furnace reached the temperature at which it was set; (c) by two dampers with fusible links which would automatically shut off the air flow if the temperature became excessive. As to the thermostat in the lobby there is testimony that at times the tenants opened it with a screwdriver and set it forward to the maximum of 82 or 83 degrees; and further that the temperature in the furnace and the ducts would be greatly in excess of that in the lobby. As to the thermostat on the furnace itself there is testimony that it could be set as high as 240 degrees. As to the dampers there is testimony that "some of them register 162, some 220." If the links on the dampers were set to fuse at 220 degrees and the thermostat on the furnace at 240 degrees a temperature of 200 degrees would operate neither. There is further testimony that the furnace was fitted with a larger feed pipe than it was designed to use thus feeding it a greater amount of oil than it was intended to burn. There was also an automatic fire signal which sounded a horn when a temperature of 160 degrees was reached, but it was on the ceiling and would only sound when the temperature at the ceiling outside the ducts rose to that point. It is further pointed out that several witnesses testified that they noticed no unusual heat in their rooms before the fire. One witness however testified that his room was very hot so that he had to open his window. We cannot say that the jury could not find on the whole evidence that Cooper's assumption that the heat in the ducts reached 200 degrees was true.

■ 3. *That there was an explosion.* Although some witnesses testified that they heard no explosion, one witness testi-

fied that he did and another testified to hearing a sound which awakened him: "Well, it seemed as if the roof was falling in in the hall." Cooper's conclusion was based on the appearance of the ducts when he first arrived at the fire and the jury on the evidence could have found this conclusion consistent with the facts proved.

 Appellant produced an expert witness and offered by him to prove an opinion as to whether the fire could have originated in the ducts based on a hypothetical question from the facts testified to by the witnesses to the fire. The able trial judge feeling himself bound by *St. Paul F. etc. Co.* v. *Southern Pac. Co., supra,* 30 Cal.App. 140 and *Gallichotte* v. *California etc. Assn., supra,* 23 Cal.App.2d 570, refused to allow him to answer such a hypothetical question. This we believe was error. The error, however, was cured by this witness' subsequent testimony. Included in the proposed hypothetical question was "whether or not there was any flame or smoke coming out of the registers." Other witnesses testified that they saw no flame or smoke coming out of the registers which conducted the hot air from the ducts to their rooms, and this witness was permitted to give his opinion as an expert that if there had been an explosion in the ducts: "The fire would take the lines of least resistance, which is out the openings rather than through the wall of the duct. Therefore, there would be fire and flame or flame and smoke blow out through the registers would be the first evidence of such an explosion of fire." "The refusal to permit an expert witness to answer a hypothetical question is harmless error where the witness, in reply to questions subsequently asked, is permitted to express his opinion fully as to the matter which his reply to the hypothesis would have covered." (10 Cal.Jur. 965-6, citing *Kline* v. *Santa Barbara etc. Ry. Co.,* 150 Cal. 741 [90 P. 125].)

 Complaint is made that respondents were permitted to introduce evidence of alterations made in the hot-air ducts of other similar dormitories after the fire. We do not so read the record. The fire occurred on January 10, 1944. Commencing on February 23, 1944, alterations were made in the hot-air ducts in other dormitories in the same project. To establish that lint and dust were present in the other ducts when they were opened, and only as a foundation for such proof, the fact of alteration was established, but without in any way showing the nature or character of the alterations. The dormitories being identical in construction and general oper-

ation proof of the presence of dust and lint in the ducts of other dormitories within such a short space of time after the fire was admissible as tending to prove a similar condition in the ducts of Dormitory O. ''Since the observed uniformity of nature raises an inference that like causes will produce like results . . . an issue as to the existence or occurrence of a particular fact, condition or event, may be proved by evidence as to the existence or occurrence of similar facts, conditions or events, under the same or substantially similar circumstances.'' (32 C.J.S., Evidence, § 584, pp. 438-9; 20 Am.Jur., Evidence, § 308, p. 286; 2 Wigmore on Evidence, 3d ed., § 438(c) p. 419; *Bone* v. *Hayes,* 154 Cal. 759 [99 P. 172]; *Dennis* v. *Crocker-Huffman etc. Co.,* 6 Cal.App. 58, 65-66 [91 P. 425]; *Moody* v. *Peirano,* 4 Cal.App. 411, 415-421 [88 P. 380]; *Yick Sung* v. *Herman,* 2 Cal.App. 633, 636-637 [83 P. 1089, 1091].) The court carefully limited the proof to this narrow issue and admonished the jury that they were not concerned with the fact of whether alterations were made in other dormitories. Appellant asked for no further instruction on the subject. We find no error in the action of the court in this regard.

Appellant offered to prove that an attempt had been made to burn another housing unit outside of this particular project at a time before this fire. We find no error in the exclusion of evidence of a single isolated attempt at sabotage in this other unit.

Appellant operated this dormitory under a written lease from Federal Public Housing Authority. No money was available under the terms of this lease for alterations or extraordinary repairs unless included in a budget estimate approved by the lessor. Critical materials, such as metals, were also hard to procure during this period. Appellant argues that its failure to remodel the ducts in Dormitory O under these circumstances cannot be held to be negligent. However the project manager had been repeatedly warned of the fire hazard created by the ducts and in the year and a half that appellant had operated these dormitories no item was included in the budget for remodeling the ducts nor any effort made to secure the necessary materials. The question of negligence in this regard was one for the jury. The fact that the dormitories were built by a federal agency would not excuse appellant from attempting to remedy a dangerous fire hazard in the dormitories after it was operating them, if one existed.

Finally appellant contends that there was no evidence that James Shepard, one of the victims burned to death in the fire, was lawfully on the premises as guest or tenant. The evidence shows that in December James Shepard and his brother Fred took a vacation trip to their home and returned to Richmond a few days before the fire. Prior to their vacation both had been tenants in Dormitory O. On their return Fred was readmitted as a tenant. James' status depends on the following testimony: At the coroner's inquest following the fire, the witness Caudle, in charge of the dormitory project gave the following testimony concerning James: "A. Neal McDowell and Fred Shepard of 043 apparently were never seen by anyone after the fire. They were known to be in the room by other tenants and they were never found outside of the building. Just about three days before the fire, James Shepard came from his home in Little Rock, Arkansas, and asked for a room. He wanted to be with his brother and the girl told him we were full up and didn't have a room and he said 'Well, would it be all right to stay with my brother?' and she said 'Yes.' "

On the trial Caudle was examined by respondents under Code of Civil Procedure section 2055. He was asked: "Q. Now isn't it a fact that you also know that James Shepard was in the building at the time of the fire and that he was a tenant there, and I will show you your testimony on Page 15 (referring to the transcript of the coroner's inquest) where you refer to James Shepard."

The witness replied:

"A. Oh, yes, sir, that's the story. If you want to read that I can."

The testimony above quoted from the coroner's inquest was then read and the following occurred:

"Q. That is what you were referring to, is that right? A. Yes, sir.

"Mr. Dana (attorney for appellant): Just a moment. The last portion of the answer read by counsel 'They were known to be in the room by other tenants' is hearsay and not known by this defendant, and we will ask that it be stricken from the record.

"The Court: It will be stricken from the record and the jurors will disregard it."

It is now claimed that the evidence concerning James Shepard was not substantive evidence, but only impeach-

ment, and therefore cannot stand as proof of the fact that he was permitted by the woman in charge of the dormitory to stay temporarily with his brother. The record contradicts this construction. It is clear that Caudle reaffirmed his testimony given before the coroner's jury and the motion of appellant's counsel to strike another portion of the testimony indicates that that was his understanding at the time.

It is true that much later in the trial Caudle testified that his testimony that James had received permission to stay temporarily with his brother was hearsay, but when this developed no motion to strike the testimony above related was made, and hearsay evidence admitted without objection is sufficient to support a finding. (*Powers* v. *Board of Public Works,* 216 Cal. 546, 552 [15 P.2d 156].)

Caudle testified later in the trial that when he learned that James was in the dormitory he ordered him to leave. He gave more than one version of this conversation. One version was: ''I didn't countermand those instructions at the office, but I told him 'You understand that we told you you couldn't stay in the dormitory no longer.' '' Whether, if this version of the transaction was accepted by the jury, it amounted to a refusal to allow Shepard to remain temporarily under the permission given by the woman in charge, would be a question of fact for the jury's determination. The jury was also entitled to consider that Caudle did not mention this conversation with James Shepard in his testimony before the coroner's jury. We find no error in the court's instruction to the jury that it was for them to determine whether James was in the building at the time of the fire as ''a tenant or guest.''

The cases were fairly tried and we find no reversible error in the record.

The judgments are affirmed.

Nourse, P. J., and Goodell, J., concurred.

A petition for a rehearing was denied May 31, 1947, and appellant's petition for a hearing by the Supreme Court was denied June 30, 1947.