NEW YORK LIFE INSURANCE COM-
PANY, a Corporation, Appellant,

v.

Joyce A. HARRINGTON, Appellee.

No. 17398.

United States Court of Appeals
Ninth Circuit.

Feb. 14, 1962.

McCutchen Doyle, Brown & Enersen,
Morris M. Doyle, Richard Murray, San
Francisco, Cal., for appellant.

Allan Brotsky, Charles W. Decker,
San Francisco, Cal., for appellee.

Before CHAMBERS, ORR and DUNIWAY, Circuit Judges.

ORR, Circuit Judge.

Appellant New York Life issued to one Arnold Harrington two insurance policies providing for double indemnity in case of accidental death. On February 5, 1960, a firearm which Arnold Harrington held pointed at his head was discharged, inflicting a wound from which he subsequently died.

Payment of that portion of the policies providing for payment in the case of death from natural causes was made. The claim for indemnity because of alleged accidental death was denied, appellant contending that the infliction of the wound was not accidental, and if not deliberate suicide, then it was the result of the handling of a dangerous weapon in such a reckless and careless manner that as a matter of law the cause of death was not accidental as provided in the policies. The case was tried to the court sitting without a jury.

After final submission the trial court made and filed among others, the following findings of fact and conclusions of law:

(1) That death was produced by a gunshot wound which was caused by the voluntary act of the deceased;

(2) That deceased knew the gun was loaded, but he thought the safety lever was in a safe position and that the gun would not fire in that condition, and further, that the gun could be pointed at his head safely in the condition;

(3) That at the time of the firing the safety lever of the gun was in the fire position, but that this condition was unknown to and unexpected by the deceased; and

(4) That the deceased had no intention to take his own life.

Appellant argues that the findings and conclusions are wrong in that they are not supported by the evidence or are not well founded in law. In resolving these contentions we take a look at the evidence as developed at the trial.

The Harringtons were married in China in 1947 and came to San Francisco shortly thereafter. As far as appears, theirs was a happy and normal home life and by 1960 there were five children in the family, ranging in age from four to eleven years.

Mr. Harrington was in 1960 employed in his lifetime occupation of lab technician at a salary of about $1,200 per month. The family, although it had no savings, was also without debts. The Harringtons were at that time purchasing a home. Mr. Harrington had two principal hobbies, ham radio, in which his wife also took part, and marksmanship and the collection of guns in which his eldest son, Arnold, Jr., occasionally participated.

On the day of his death Mr. Harrington had been home from work due to a slight reaction from a flu shot. During the day he took his wife across the city for a visit and became angry because she was late in returning and preparing dinner. As a result, the Harringtons had a minor quarrel, after which the insured left the house to spend some time by himself. He returned after about an hour and when his wife still refused to make up with him he went into a bedroom and returned to the living room with a recently acquired German Mauser semi-automatic pistol. He seated himself on the couch next to his wife and proceeded to handle the weapon and cause it to make certain clicking noises. These sounds were attributed to the hammer falling to the firing position either (1) by trigger pressure, (2) by "fanning" or pulling the hammer back slightly from the cocked position and releasing it, or (3) by moving the gun's safety lever forward from the fire position to the safe position.[1] While so oc-

---

1. Thus, in order to make this sound with a loaded gun without its discharging, the safety would always have to be in the "safe" position just as the sound was made and immediately thereafter.

cupied Mr. Harrington was drinking a highball, but he did not become intoxicated. Also in the living room at the time was the eleven year old Arnold, Jr.

Mr. Harrington's activity with the gun annoyed his wife, and she asked that he stop it. He thereupon got up, walked a few paces beyond a coffee table which stood in front of the couch, and turned to face his wife, but continued to make the clicking noise with the pistol. His wife testified that she again requested that he stop this, but in response Mr. Harrington said: "Don't worry. The safety is on. Look, I will show you." As his wife looked up, Mr. Harrington put the gun to his temple and it immediately discharged the fatal bullet. The police and an ambulance were summoned and Mr. Harrington was taken to a hospital where he died later that evening.

There was testimony at the trial that the safety mechanism on the Mauser was very reliable, and that when it was in the correct position the chances were infinitesimal that it would fail to operate properly.

The controlling issue for our consideration is whether the death of Mr. Harrington "resulted directly, and independently of all other causes, from accidental bodily injury * * *" within the meaning of the double indemnity provisions of the insurance policies. We first consider the contention that as a matter of law the findings show that the death was not accidental because it resulted from an act so dangerous that death followed as a foreseeable and natural consequence.

■ In construing the term "accidental" in these policies, we are called upon to determine primary rights and obligations of the parties, giving effect to their reasonable pre-litigation expectations. In the solution of this type of problem we resort to California law

under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

California courts have held that the terms of an insurance policy must be construed so as to accord with the understanding of the ordinary · person. See Prickett v. Royal Ins. Co., 56 A.C. 225, 228, 14 Cal.Rptr. 675, 363 P.2d 907, 909 (1961). With particular reference to the term "accidental," the California courts have consistently adhered to the definition originated in Ripley v. Railway Passengers' Assur. Co., Fed. Cas.No. 11,854; 20 Fed.Cas. 823, 825 (W.D., Mich., 1870), affirmed, 16 Wall. 336, 21 L.Ed. 469:

" * * * chance, casualty, contingency, unexpectedly happening by chance, unexpectedly taking place, not according to the usual course of things."

See, e. g., Richards v. Travelers Ins. Co., 89 Cal. 170, 26 P. 762 (1891); Rock v. Travelers Ins. Co., 172 Cal. 462, 156 P. 1029, L.R.A.1916E, 1196 (1916); and compare Zuckerman v. Underwriters at Lloyds, 42 Cal.2d 460, 473, 267 P.2d 777, 784 (1954):

" * * * casualty—something out of the usual course of events and which happens suddenly and unexpectedly and without any design of the person injured."

■ In short, under these policies the result must be something out of the ordinary, and objectively and reasonably unexpected by the insured. While there is in the older California cases a recurring distinction made between accidental "results" and accidental "means," the parties are in apparent agreement that it is not material in this case, and in any event, there is evidence that it is no longer strictly adhered to by the California courts. See, e. g., Cox v. Prudential Ins. Co., 172 Cal.App.2d 629, 343 P.2d 99 (1959).[2]

---

**2.** Insofar as a state intermediate appellate opinion signifies a genuine trend in the relevant state law, we follow it.

See Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940).

■ The trial court found as a fact that Mr. Harrington did not expect death to result from his act. New York Life argues that his act was so dangerous that he must be presumed to have expected it. In support of that argument appellant cites cases where an insured attempted acrobatic stunts on a bridge rail while he was drunk,[3] or permitted a can to be shot off his head,[4] or put a loaded revolver to his head and pulled the trigger, relying not on a safety mechanism, but on the fortuities of fate to bring the chamber to rest in a safe place after being spun.[5]

The instant case is unlike those cited in one critical respect, and that is the reasonableness of the insured's belief that the questioned activity was safe. For example, unlike the insured in Thompson, supra, note 5, Mr. Harrington here had a far more reasonable basis for his belief that the gun was safe. He could not have made the previous clicking noises without the gun discharging unless the safety was in place. And he did nothing intentional that would render his reliance on the safety unreasonable, such as the spinning of a chamber in a revolver would render reliance on a safe position of the bullet unreasonable. Once it is established that his belief in the safety was not unreasonable as a matter of law, the death was as to him unexpected.

It is probably true that the average person familiar with firearms would not put a gun to his head under *any* circumstances.[6] The judicial mind, too, may be shocked by such conduct, particularly where hindsight reveals the actual, tragic outcome. Yet, that which deters the average man, even under what

Mr. Harrington might reasonably have supposed the circumstances to be, is not an expectation of death under those supposed circumstances, but rather the certainty of death if the circumstances are *other* than supposed. Under California law, Mr. Harrington's expectation as to what would happen, based upon his reasonable supposition, controls here. As to him, death was unexpected. Therefore, when death occurred, it was "accidental" within the meaning of these policies.

■ Other points urged by New York Life are that the trial court's findings with respect to Mr. Harrington's expectation are founded upon inadmissible evidence, and therefore must be overruled. In approaching consideration of this assignment we bear in mind that the case was tried before the court, and the rules of admissibility should not be applied with the same strictness as when a jury is present. It is presumed that the trial court will not be influenced by the receipt of inadmissible evidence as will a jury. As a matter of fact a court must hear the import and substance of the challenged evidence before it can intelligently rule on its admissibility. Rule 43(a), F.R.Civ.Proc., 28 U.S.C.A. provides:

" * * * All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States Court is held. In any case, the statute or rule which favors the reception of the evidence governs [7] * * * *."

---

3. Kinavey v. Prudential Ins. Co., 149 Pa. Super. 568, 27 A.2d 286 (1942).

4. Baker v. Nat. L. & A. Ins. Co., 201 Tenn. 247, 298 S.W.2d 715 (1956).

5. Thompson v. Prudential Ins. Co., 84 Ga. App. 214, 66 S.E.2d 119 (1951).

6. While Mr. Harrington might thus be considered to have been "negligent" or to have "assumed a risk" as those terms are used in defining tort liability, that fact

alone does not control the finding of "accidental" under these policies, where the test is of a different kind. See, e. g., Lovelace v. Travelers' Prot. Ass'n, 126 Mo. 104, 28 S.W. 877, 30 L.R.A. 209 (1894).

7. This rule recognizes that the command of Erie R. Co. v. Tompkins, supra, does not apply with full vigor in the application of rules which do not affect primary,

Under the circumstances we see no reversible error in the admission of the challenged evidence.

New York Life first challenges the admissibility of the deceased's last statement, recited on the stand by his widow: "Don't worry. The safety is on. Look, I'll show you." It is said that this is hearsay and therefore should have been excluded. Appellee points out that insured's state of mind regarding an intention or expectation of death was in issue and therefore the statement was admissible, for the purpose of proving that state of mind. In Whitlow v. Durst, 20 Cal.2d 523, 524, 127 P.2d 530, 531 (1942), the California Supreme Court stated and applied the usual rule:

"When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving." *Accord:* Foster v. Winningham, 169 F.2d 46, 48–49 (CA 10, 1948); Boaz v. Mut. Life Ins. Co., 146 F.2d 321, 323 (CA 8, 1945). Only where there is risk of great confusion and prejudice from statements made under extremely doubtful circumstances will those statements be excluded from consideration, at least for what they might be worth. Such a case was People v. Hamilton, 55 Cal.2d 881, 13 Cal.Rptr. 649, 362 P.2d 473 (1961).

Mrs. Harrington characterized her husband's appearance as he fell from the gunshot wound as one of "great surprise," and she stated that "he threw up his hands as he fell." Appellant challenges this testimony as a conclusion and opinion of the witness. But a witness is to be allowed some latitude in giving a shorthand description of events involving manifestations of familiar but complex emotions. See, e. g., People v. Dea-

con, 117 Cal.App.2d 206, 210, 255 P.2d 98, 101 (1953); Manney v. Housing Authority, 79 Cal.App.2d 453, 459–60, 180 P.2d 69, 73 (1947); Healey v. Visalia & T. R. Co., 101 Cal. 585, 36 Pac. 125 (1894); Niagara Fire Ins. Co. v. Muhle, 208 F.2d 191, 196 (CA 8 1953). That latitude was not exceeded here.

Objection is also made to the testimony of a police officer relating a statement Mrs. Harrington made to him in response to his question just as he arrived on the scene not more than ten minutes after the accident. The officer asked her what happened. Mrs. Harrington, coming out of her house to meet him replied, "My husband just shot himself, but he didn't mean it." Appellant claims this should have been excluded because it is hearsay, self-serving, and a conclusion. Appellee argues that it was admissible under the "res gestae" doctrine. This exception to the hearsay rule has been established in recognition of the probable reliability of statements made under the stress of nervous excitement brought on by witnessing or participating in a shocking event. The evidence is admissible when it is found that there had not been time for the witness to reflect or contrive. When the shock is great, that period may be longer, when the excitement is less, the period is shorter.

In this area of varied fact situations the special competence of a trial judge must be recognized. It is here that the practice "in the courts of the United States on the hearing of suits in equity" under rule 43(a), supra, furnishes the best guidance. There is necessarily and properly a broad discretion in the trial court sitting without a jury as to what evidence shall be admitted. Aluminum Company of America v. Sperry Products, 285 F.2d 911 (CA 6, 1960). It is for the trial court in the first instance to determine from the evidence whether

out-of-court conduct, even though they may affect the "outcome." See Monarch Ins. Co. v. Spach, 281 F.2d 401, 407–408

(CA 5, 1960) and Hart and Wechsler, The Federal Courts and The Federal System 634 (1953).

the res gestae exception applies. Navajo Freight Lines v. Mahaffey, 174 F.2d 305 (CA 10, 1949).[8] In finding and applying rules of evidence under the practice established by rule 43(a), the trial judge's chief censor is the conscience of a Chancellor. Dallas County v. Commercial Un. Assur. Co., 286 F.2d 388, 394 (CA 5, 1961).

It is thus permissible for the trial court to admit and assess such evidence giving it such weight as it seems to warrant. We cannot say that on this record the trial judge went beyond this standard. This challenged evidence is merely cumulative on the matter of the deceased's state of mind. Its admission, if error, was harmless. See Eckis v. Graver Tank & Mfg. Co., 289 F.2d 335, 338 (CA 9, 1961); Gerhart v. Henry Disston & Sons, 290 F.2d 778, 786 (CA 3, 1961).

Affirmed.

CHAMBERS, Circuit Judge (concurring).

On the record here, I am convinced the California appellate courts would sustain the decision of the trial court. Were I on the highest court of California, which I shall never be, I would not vote to sustain the finding of an "accident." (I have no other trouble with the case.) Also, I am a little influenced by Williams v. Carolina Life Insurance Co., 348 U.S. 802, 75 S.Ct. 30, 99 L.Ed. 633, and by Johnson v. Union Pacific, 352 U.S. 957, 77 S.Ct. 359, 1 L.Ed.2d 316. Counsel for appellant, as I, can readily distinguish these two cases from the Harrington case. Nonetheless, they reveal an approach which I think might prevail on certiorari were we to reverse the district court here.

Reluctantly, I concur.

---

**8.** *Accord*: Showalter v. W. P. R. R. Co., 16 Cal.2d 460, 468, 106 P.2d 895, 900 (1940); Dolberg v. Pac. Elec. R. Co., 126 Cal.App.2d 487, 489, 272 P.2d 527, 528 (1954).