[No. F048042. Fifth Dist. Aug. 31, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
GLEN MAURICE JOHNSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(c)(1) and 976(c)(3), this opinion is certified for publication with the exception of part 1.

**COUNSEL**

Joan Isserlis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stan Cross and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GOMES, Acting P. J.—**

## PROCEDURAL HISTORY

On March 19, 2003, a jury found, inter alia, Glen Maurice Johnson not guilty of the first degree murder of Lamar Rufus but guilty of second degree murder, conspiracy to murder, and accessory to murder. (§§ 32, 182, subd. (a)(1), 187, subd. (a).)[1] On June 23, 2004, we rejected his insufficiency of the evidence argument but reversed the judgment and ordered a new trial since the court impermissibly lowered the prosecution's constitutional burden of proof by misinstructing the jury on reasonable doubt. (*People v. Johnson* (2004) 119 Cal.App.4th 976 [14 Cal.Rptr.3d 780].)

On April 1, 2005, a jury again found Johnson, inter alia, guilty of second degree murder, conspiracy to murder, and accessory to murder. Before his probation and sentencing hearing, his attorney learned, while attending portions of the trial of Arthur Lenix, who likewise was being prosecuted for Lamar's homicide, that Lenix's attorney had police reports that he had never seen and that the prosecutor had never disclosed to him, with information about the involvement of the prosecution's sole eyewitness to the killing, Lamar's cousin Curtis Rufus, in a shooting outside a convenience store before Johnson's second trial.[2] On the basis of the information in those reports, Johnson sought a new trial, but the prosecutor opposed, and the court denied, the motion.

On appeal, Johnson argues, as before, insufficiency of the evidence and raises, inter alia, two new issues. He argues that there is a reasonable probability that the result of his trial would have been different had the prosecutor not withheld those police reports from him. On the ground that the jury's not guilty verdict of first degree murder at his first trial rejected the mental state of premeditation and deliberation common to first degree murder and conspiracy to murder, he argues that the double jeopardy clause precludes a retrial of the conspiracy to murder charge.

Although we will reject Johnson's insufficiency of the evidence and double jeopardy arguments, we will determine that the prosecutor's withholding of discovery violated due process and will reverse the judgment and order a new trial on that ground.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] Initial references to the decedent, Lamar Rufus, and his cousin, Curtis Rufus, are by first and last names, but for brevity and clarity subsequent references are solely by first names. No disrespect is intended.

## FACTUAL HISTORY

Having grown up together, worked together, and hung out together, Curtis and Lamar were extremely close to each other—more like brothers than cousins. On the evening of September 19, 2002, they partied together at the Rockin' Rodeo nightclub for several hours until closing time. After Curtis gave Lamar a ride to the spot where he had parked his car, they both drove their cars to a convenience store and parked beside each other in an alley behind the store. Curtis went inside the store to get a bottle of water but, noticing "some commotion outside, people were scrambling, and moving fast," he left the store to look for Lamar and found him waiting outside. Some people were just walking, others were walking fast, and some were running to their vehicles. Everyone seemed to be leaving in a hurry.

Curtis and Lamar "stood there for a second to kind of let traffic vacate a little bit," headed down the alley toward their cars, and encountered Johnson and Lenix coming out of a perpendicular alley along the way. Curtis thought Johnson seemed "zombied out," possibly from alcohol, so he patted him on the chest in a friendly way as he and Lamar passed them by and said, "[H]ey, man, wake up." Moments later, Curtis heard the "rather odd sound" of an object hitting the ground. Lamar said, "Curt, this guy dropped a .38." Curtis saw Lenix pick up and stuff into his waistband an object from the ground. Curtis said, "[H]ey, let's go, let's get outta here right now, let's leave."

Curtis and Lamar got into their cars, started them up, and turned on the headlights, but before they put their cars into gear Deshonta Grayson walked over and opened the door of Lamar's car. Curtis got part way out of his car, with his right foot on the floorboard, his left foot on the ground, and his right forearm on the roof, and asked Grayson, "[W]hat are you doin'?" Grayson turned toward where Johnson and Lenix had walked down the alley and said, "[L]et's get outta here, these East Side Niggers are up here trippin'." Curtis had seen Country Boy Crips there, but no East Siders (a term for East Side Crips), so he thought Grayson's comment was odd. He testified, "I'm not gang related, never been gang related, and it just kind of struck me."

Curtis told Lamar, "[N]ever mind what this guy's talkin' about, let's go now." Curtis got back into his car and started driving down the alley to clear a way for Lamar since they "were trying to leave in a hurry." He looked into his rear view mirror, saw that Lamar's car had not moved, and backed up at an angle to make "like a reverse three point turn" so he could go back. Looking over his shoulder while turning, he saw Lamar standing on one side of the car, Grayson standing on the other side of the car, and Lenix walking up behind Lamar.

Still looking over his shoulder, Curtis saw Lenix raise a gun and fire two or three shots at Lamar's head, saw Lamar fall to the ground, and saw a car enter from the perpendicular alley. Grayson and Lenix stood over Lamar "for like a split second." Lenix started to walk away, but Grayson, after taking one or two steps toward the car that entered from the perpendicular alley, started to run toward Curtis. Curtis accelerated toward Grayson and Lenix, hoping to run them over. Lenix fired three or four shots in his direction, but Grayson had cut in front of his car, and a bullet struck him. When the car that entered from the perpendicular alley stopped and Lenix opened the door to get inside, Curtis saw a person driving whom he could not identify by name but whom he had known around town for years and whom he later identified from a high school yearbook photograph as Johnson.

At trial, Curtis narrated a security camera tape showing him and Lamar walking toward their cars, Johnson and Lenix walking out of the perpendicular alley, Lenix bending over to retrieve an object he put into his waistband, and Grayson walking down the alley. The homicide occurred outside camera range. In fear of his life, Curtis initially refused to identify any of the members of the Country Boy Crips he saw that night, but after the court instructed him to answer he identified one, after which he testified he was "not sure of the rest of their names."

Martin Heredia, a police gang expert, identified Johnson and Lenix as members of the Country Boy Crips. He testified that Johnson's "CBC" (Country Boy Crips) and "NC" ("neighborhood country" or "notorious country") tattoos confirmed he was a Country Boy Crips member. A field interview card established his connection with a motel that served predominantly as a hangout for the Country Boy Crips. Police reports showed Johnson wrote a letter to a known Country Boy Crips shooting suspect and admitted to officers his membership in the Country Boy Crips. Another sign of his gang membership was his identifying himself at several of his bookings in the county jail as a Country Boy Crips member.

With reference to Johnson and Lenix alike, Heredia opined that each had earned the status of "shot caller" or "original gangster" (OG) by achieving the deference and respect of other gang members through age, performance of gang activities, and long-term Country Boy Crips membership. Asked the hypothetical question if there was a reasonable possibility that an OG planning to commit a murder by walking up and shooting someone in the head and escaping with the assistance of another OG would not discuss those plans ahead of time with the other OG, Heredia replied in the negative. He identified Lamar as a West Side Crips member on the basis of information from a field interview card and a county jail booking. He interviewed Grayson in the emergency room on the night of the homicide, but Grayson told him nothing about the shooter's identity.

## DISCUSSION

1. *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Withheld Discovery*

Johnson argues that there is a reasonable probability that the result of his trial would have been different had the prosecutor not withheld from him police reports that he had never seen and that the prosecutor had never disclosed to him with information about Curtis's involvement in a shooting outside a convenience store before Johnson's second trial. The Attorney General argues the contrary.

■ In *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.* at p. 87, italics added.) In later cases, the high court broadened the scope of the holding in *Brady* by finding a duty to disclose even in the absence of a request by the accused (*United States v. Agurs* (1976) 427 U.S. 97, 107 [49 L.Ed.2d 342, 96 S.Ct. 2392]), by finding a duty to disclose not only as to exculpatory evidence but also as to impeachment evidence (*United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 105 S.Ct. 3375] (*Bagley*)), and by finding evidence *material* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (*id.* at p. 682; see also *Kyles v. Whitley* (1995) 514 U.S. 419, 433–434 [131 L.Ed.2d 490, 115 S.Ct. 1555]).

Only a few years ago, citing *Brady* and its progeny with approval for articulating "the special role played by the American prosecutor in the search for truth in criminal trials," the high court encapsulated in one sentence the three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 [144 L.Ed.2d 286, 119 S.Ct. 1936] (*Strickler*).) Here, where the sole component at issue is prejudice, Johnson can meet his burden of establishing a *Brady* violation only if he shows that the withheld discovery was *material* in the sense "that 'there is a reasonable

---

*See footnote, *ante*, page 776.

probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." (*Id.* at p. 289; see also *Bagley, supra,* 473 U.S. at p. 682.)

First, we turn to the record of Johnson's trial. As to whether Curtis had any gang affiliation, the evidence shows a synergy of the absence of any evidence of any criminal street gang affiliation and the presence of his self-serving testimony that "I'm not gang related, never been gang related." In argument to the jury, the prosecutor took full advantage of that state of the record: "This isn't a situation where Curtis would have any reason to come in here and say what he's told you, unless it were true. [¶] On the other hand he does have every reason, every reason in the world, to come in here and tell you the truth." He reiterated his point: "Curtis has no reason to want to see the defendant locked up, other than the fact that Curtis knows that he killed Lamar."

In argument to the jury, Johnson's attorney acknowledged the obvious—the "whole case keys on Curtis Rufus"—and emphasized that no evidence corroborated his chronology of the homicide. He implored the jury to find that the images captured by the store's security tape of traffic speeding through the alley right after the shooting were inconsistent with Curtis's testimony. He pointed out the lack of any evidence at all that Curtis left tire marks, hit anything, or suffered so much as a scratch to his car. "He's making it up," he argued. "He made up the whole thing."

In rebuttal, the prosecutor characterized as nonsensical the notion that Curtis drove by, saw Lamar lying there, and quickly concocted an "elaborate" scheme "to frame two people that he doesn't even really have a clear grudge against." In summation, he stressed Curtis's impartiality and precision as an eyewitness: "The fact of the matter is, ladies and gentlemen, you have a case with frankly a very articulate witness, who has no pre-existing biases or reasons to want to come in here and make up stories against this defendant, if they weren't true. [¶] The fact of the matter is, I want you to reach for justice, and I would ask you, in doing that, not to let this man get away with murder."

Second, we turn to the withheld discovery, which comprises 45 pages of police reports about a police investigation into a shooting outside a convenience store after Johnson's first trial but before his second trial. Those reports paint quite a different picture of Curtis from the one in the record of Johnson's second trial. Images captured by the store's security tapes show Curtis taking a chrome semiautomatic pistol from beneath his shirt and pulling back on the slide to chamber a round. The next images show a "heavy set black male" in a white T-shirt, whom officers identified as Deon Davis, a member of the Westside Crips criminal street gang, working his way toward

Curtis, with whom he exchanged words and from whom he took the pistol. The next images show Davis walking toward the front of the store with the pistol "fully extended" in his right hand toward the doors. The next images show Davis leaving the store, walking toward a parked silver vehicle, getting into the driver's door of the car, backing the vehicle out of the parking stall, and driving out of the range of the security camera. Johnson's new trial motion noted that the security tapes show Curtis "was somehow involved in an exchange of gang gunfire, spoke with a known gang member, and then allowed that known gang member to take the handgun from him."

The police reports show that a woman outside the store moments before the shots were fired saw "three male subjects" standing next to a newsstand not far from a silver vehicle parked nearby. She next saw a "heavy set black male" wearing a white T-shirt walk in front of the store from the direction of the newsstand, hunch down, and run back toward the front of the store. She told officers that she saw "one to three black males" standing next to the newsstand, that "the subject wearing a white T-shirt" walked to the corner of the store while "the other two subjects possibly entered the store," and that during the shooting she saw the feet of someone "firing toward the heavy set black male wearing the white T-shirt."

With reference to his involvement in the incident, the police reports show that Curtis denied possessing a weapon and lied to officers about the events inside the store but changed his story after learning of the images captured on the security tapes. He told officers that after witnessing his cousin Lamar's homicide and receiving death threats he feared for his life so he carried the pistol into the store to defend himself against gang members to whom, according to reliable information from his associates, the homicide suspect had given active orders to murder him to keep him from testifying. He told officers that when he heard the gunshots he thought "he was being fired on by a criminal street gang member/s [sic] attempting to kill him" so he took out his handgun and chambered a round.

With reference to his weapon, Curtis told officers that a suspect who wore a white shirt, who said something to him he could not understand due to the noise of the gunfire, and who apparently was not armed took the pistol out of his hands and walked out the front door of the store. Officers recovered from outside the store five nine-millimeter pistol casings of the same brand as a 50-round box of nine-millimeter ammunition seized from Curtis's home. Nine rounds were missing from that box. Johnson's new trial motion noted that Curtis "was prepared to and did lie about the handgun to law enforcement officers, and only confirmed its possession when confronted with the

evidence of the video," and that he "apparently unlawfully carried a concealed firearm, supplied it to a gang member during a shootout, lied about same to a law enforcement officer, and indicated some acquaintance with the other fellows involved."

With reference to his clothing, the police reports show that at the time of his interview with officers Curtis was wearing "a blue work shirt with the name of Curtis on it, a blue baseball cap and grayish-blue sweat pants" and that "while he was inside the store during the incident" he was wearing "a dark blue denim, button up shirt" and "dark blue denim jeans." Johnson's new trial motion noted that when officers interviewed Curtis he "was wearing clothing that could reasonably be associated with gang membership."

Johnson's new trial motion noted that his attorney ran a search for Curtis in the Criminal Justice Information System (CJIS) before his second trial but "the existence of these reports did not show up." The motion noted that in a conversation with Johnson's attorney after the verdicts in his second trial the prosecutor candidly acknowledged that his failure to provide the police reports to the defense was "an oversight on his part." The motion argued that Curtis, the prosecution's "chief witness," testified "he had no gang affiliations or connections" and that "the prosecution relied upon expert testimony to establish gang connections of the two alleged perpetrators in order to support its theory of the case," all of which gave the jury a "vital interest" in knowing that Curtis "carried a gun in circumstances suggestive of gang activity, associated with gang member(s), [and] gave that gun to a known gang member." In opposition to the motion, the prosecutor stated he "provided a copy" of the police reports to Lenix's counsel but not to Johnson's counsel since Johnson's "case was on appeal." After hearing argument, the court denied the motion.

On appeal, Johnson argues that Curtis "had lots of reasons to lie. If his gang connections did not give him reason to lie, his fear of prosecution and hope for continued immunity from prosecution, and his consequent wish to be of use to the police and prosecutor[,] gave him motives to lie." He argues that the prosecutor "had no evidence that corroborated Curtis's testimony," "no physical evidence that tended to show [Johnson] drove the killer from the crime scene," "no confession or admissions," and no "witness who lent support to Curtis's claim that he (Curtis) was in the alley not far from Lamar at the time Lamar was shot." The record bears out those arguments.

The Attorney General commendably acknowledges that since the police reports "contained some potential impeachment evidence regarding Curtis" the prosecutor should have disclosed that evidence to Johnson. Nonetheless, he argues that the withheld discovery "portrays Curtis as a

neutral bystander during a convenience store shooting." That is one possible inference from the police reports, but hardly the only one. The prosecutor's withholding of discovery denied Johnson the opportunity to impeach Curtis with his attire, conduct, and firearm possession during the convenience store shooting and with his lies to the police afterward. Likewise, the prosecutor's breach of duty denied Johnson the opportunity not only to cross-examine the gang expert about the gang implications of Curtis's involvement in the convenience store shooting but also to argue to the jury inferences contrary to the Attorney General's "neutral bystander" inference.

In short, the record of Johnson's trial and of the withheld discovery show that since the withheld discovery was *material* in the sense "that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense" the prosecutor's withholding of discovery violated due process. (*Strickler, supra,* 527 U.S. at p. 289; see also *Bagley, supra,* 473 U.S. at p. 682.) That Johnson's case was on appeal when the prosecutor withheld discovery is no excuse for his "concealment of relevant and material evidence" from the defense. (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234]; see also *People v. Garcia* (1993) 17 Cal.App.4th 1169, 1179–1182 [22 Cal.Rptr.2d 545].) Our duty is to reverse the judgment and order a new trial.

### 3. *Double Jeopardy*

On the ground that the jury's not guilty verdict of first degree murder at his first trial rejected the mental state of premeditation and deliberation common to first degree murder and conspiracy to murder alike, Johnson argues that the double jeopardy clause precludes a retrial of the conspiracy to murder charge.[3] The Attorney General argues the contrary.

■ The parties agree on the underlying principle of California criminal law. The mental state of conspiracy to murder is " 'functionally indistinguishable from the mental state of premeditating the target offense of murder,' " so "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232, 1237 [77 Cal.Rptr.2d 733, 960 P.2d 537] (*Cortez*).) The holding in *Cortez* repudiated the prior rule that conspiracy to murder could be conspiracy to commit first degree murder, conspiracy to commit second

---

[3] Johnson raises his double jeopardy argument in the context of an ineffective assistance of counsel argument challenging his attorney's failure to have him so plead before his second trial. (See § 1016, subds. 4, 5.) Our reversal of the judgment on a different ground moots the context of his argument, but not the substance, which we address to guide the court at Johnson's new trial.

degree murder, or conspiracy to commit manslaughter. (*Id.* at pp. 1230–1238, overruling *People v. Horn* (1974) 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300].)

The parties disagree, however, on the impact, if any, of *Cortez* on the double jeopardy issue. Johnson posits *Ashe v. Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469, 90 S.Ct. 1189] (*Swenson*) as "[t]he case that governs here." In *Swenson,* a jury found the accused not guilty of the armed robbery of a player at a poker game, but after the prosecutor charged him with the armed robbery of another player at the same game a different jury found him guilty of that charge. (*Id.* at pp. 437–440.) "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit," the United States Supreme Court held, bringing the collateral estoppel doctrine within the protection of the double jeopardy clause for the first time. (*Id.* at pp. 443, 445.) "The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not," the high court wrote, condemning the accused's second prosecution as "wholly impermissible." (*Id.* at p. 445.)

A line of United States Supreme Court cases shows *Swenson* is inapposite. In *Dunn v. United States* (1932) 284 U.S. 390 [76 L.Ed. 356, 52 S.Ct. 189] (*Dunn*), disapproved on another ground by *United States v. Powell* (1984) 469 U.S. 57, 64 [83 L.Ed.2d 461, 105 S.Ct. 471] (*Powell*), the court held that a person whom a jury finds guilty on one count cannot attack that conviction on the ground of inconsistency with the jury's not guilty verdict on another count. (*Dunn, supra,* at pp. 392–394.) " 'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' " (*Id.* at p. 393.) "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (*Id.* at p. 394.)

In *Powell, supra,* 469 U.S. at pages 64–65, the high court lauded *Dunn*'s "sound rationale" and observed that inconsistent verdicts "present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." As "imprudent and unworkable," *Powell* rejected the notion of allowing "criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the

reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." (*Id.* at p. 66.) The high court noted "that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." (*Id.* at p. 67.)

Johnson notes that at the probation and sentencing hearing at his first trial the prosecutor commented that the guilty verdict of conspiracy to murder and the not guilty verdict of first degree murder might be "at least understandable" if the jury had "felt that [a] minute or less was insufficient to constitute premeditation and deliberation." He urges us to infer from the prosecutor's comment that the jury "either believed [he] did *not* premeditate the murder or deliberate on the murder, or it *doubted* whether he engaged in premeditation and deliberation. In other words, it acquitted [him] of premeditating and deliberating." We decline Johnson's invitation to indulge in the "pure speculation" that *Powell* decries. Instead, we abide by the general rule that "inherently inconsistent verdicts are allowed to stand. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 656 [106 Cal.Rptr.2d 629, 22 P.3d 392].) "Nor does the existence of inconsistent verdicts imply that the jury must have been confused. [Citation.] An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. [Citations.]" (*Ibid.*; see § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count."])

■ Additionally, a "single rationally conceivable issue" was in dispute before the first jury in *Swenson*, but several disparate issues were in dispute before Johnson's first jury. (*Swenson, supra,* 397 U.S. at p. 445.) Was he guilty of first degree murder? Or was he guilty of second degree murder? Which of the 13 overt act allegations was true? Was he guilty of conspiracy to murder? Was he guilty of accessory to murder? The collateral estoppel doctrine bars relitigation of an issue decided at a previous trial *only* " 'if (1) the issue *necessarily decided* at the previous trial is *identical* to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial.' [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 163 [115 Cal.Rptr.2d 614, 38 P.3d 461], italics added.) The mélange of issues implicit in the verdicts here likewise precludes application of the collateral estoppel doctrine. No double jeopardy bar exists to Johnson's again standing trial on the charge of conspiracy to murder.

## DISPOSITION

The judgment is reversed and a new trial is ordered.[4]

Dawson, J., and Hill, J., concurred.

---

[4] For lack of ripeness, we address none of Johnson's other issues. "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. . . . It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306], citation omitted.) Whether any of Johnson's other issues will be ripe after his new trial is purely speculative. Nonetheless, we commend to the court and counsel alike a careful reading of *People v. Killebrew* (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876] since the gang expert who testified before is likely to testify again and since the prosecution, the defense, and the judiciary share a common interest in securing a fair trial that does not sow the seeds of a reversal on appeal.