[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1197 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1198 
OPINION
A jury convicted Kenneth Elbert Steele of assault, assault by means of force likely to produce great bodily injury, terrorist threats and attempted false imprisonment. (Pen. Code, §§ 240, 245, subd. (a)(1), 422, 664, 236; further unspecified section references are to this code.) The trial court sentenced defendant to prison for three years eight months, and he timely filed this appeal.
 We reverse the felony assault conviction because no substantial evidence shows that defendant had the "present ability" to ignite oven gas and thereby injure the victim. We reject defendant's other claims and remand for resentencing. *Page 1199 
 BACKGROUND The victim was defendant's "on and off again" girlfriend for about three years. For a while they lived together in the victim's "10 by 54" foot mobilehome, at the Almond Grove Mobile Home Park. As late as Christmas 2005, the victim hoped the relationship would work out. They were not living together and the victim had moved out of the mobilehome, although she kept kittens there that she took care of. On December 28, 2005, while the victim was at the mobilehome, defendant arrived; when she asked him if he had been using drugs, he became enraged. He pinned her to the bed "and tried to suffocate me with his hand over my mouth and pinching my nose." He said "He was going to kill me and then himself . . .," and she believed him, because she was fighting to breathe and praying.
 The victim's memory of the details and sequence of what happened after that initial instance of suffocation was uncertain, but she described the following events:
 At some point defendant turned on the oven gas "and left the door open to try to kill both of us, and he was later going to ignite it." The victim smelled the gas and defendant said "he would be able to blow us up." She ran outside but defendant grabbed her and carried her back into the mobilehome. During this time her face was "smashed" into a van seat on her patio, but according to her testimony defendant did not cause this injury. She was pinned to the bed and could smell the gas. Defendant told her he was waiting for it to fill the mobilehome "and then he was going to ignite it." He held up a lighter "and showed me that it didn't make a flame." When "he felt that he waited long enough, he lit it and it didn't do anything." The victim testified some of the windows were open; "It's very well ventilated so luckily it [i.e., the concentration of flammable gas] wasn't enough to do any damage."
 At some point the victim reached a telephone but defendant broke it in half.
 Defendant had a knife, and cut or scratched her neck "just a small little bit, not a lot, and then he handed it to me and asked me to put it into him." "He said he was going to kill me and kill himself." She believed him. He also took a rope, "tied one end with a noose knot, a slip knot type thing, and one on the other end as well and put it both over our heads and said we could go together." He never tightened the knots, and then he simply took the rope off.
 Then he tied a plastic bag over her head, "and said just in case he was going to put a second one on and proceeded to do that." The bags were on her head "Long enough for me to feel like I was going to die." *Page 1200 
 He then wrapped duct tape around her face, hair and head, and she could not breathe. He said "`You won't get through this one' to me." Eventually he took the tape off of her.
 The next morning, after defendant helped clean "the duct tape glue out of my hair and help clean me up," he let her walk away. He apologized and blamed drugs for his actions. She arranged a ride to a sheriff's station from where she was taken to the hospital by ambulance. While at the hospital she was told her jaw was broken.
 Photographs introduced into evidence depict her injuries, including where "he pulled the hair out of my head"; she still had bald spots as a result.
 At the time the above events took place, the victim had a restraining order against defendant. Some of the incidents that led her to get the order included defendant pulling her hair out on a prior occasion, cutting her with his fingernail and saying that this would give her hepatitis, pushing her against a wall, and threatening to kill her.
 The victim has since met with defendant and received his telephone calls and letters; she still loves him, but is also afraid of him. In one letter he encourages her to seek lenity for him with the prosecutor.
 Deputy Gregory Faber, who saw the victim at the station, described her as covered with bruises and cuts over her entire body. She had the sticky remnants of duct tape in her hair, and bald spots that were "red and really irritated." She told Deputy Faber that "once she told [defendant] they were no longer going to be together, that's when he went ballistic on her." At one point the victim said she could "see a flame, didn't know if it was a match[,] lighter or what, appeared [defendant] was trying to ignite the gas."
 A couple of boys at the mobilehome park heard a woman screaming for help that night, and saw a man hitting her in the face and choking her.
 A neighbor of the victim saw defendant with scratches on his face, and defendant told him, "him and his girlfriend got in a fight and that she scratched him."
 In 2000, in Placer County, defendant pleaded no contest to inflicting corporal injury on a cohabitant. (§ 273.5.)
 Defendant testified that the victim scratched his face when he would not give her the telephone. After she went outside and fell down the stairs, he helped her back into the mobilehome. They stopped arguing and went to *Page 1201 sleep; when he woke up, he found she had tape in her hair. In the course of helping her clean the tape out of her hair he applied a substance which she said burned her, and she began panicking. Defendant denied putting bags on the victim's head, touching her throat with a knife, turning on oven gas or trying to light it, wrapping her head with tape, pulling out her hair, slamming her face into a seat, or wrapping rope around her neck or his neck. He admitted he had been served with the restraining order, but claimed the victim told him it had been lifted.
 The pleadings, prosecutorial election and verdicts show the following:
 Count one, charging felony assault with a deadly weapon, based on defendant's act of putting a bag on the victim's head — guilty of misdemeanor assault.
 Count two, charging assault with a deadly weapon, based on the use of a knife — not guilty.
 Count three, charging assault by means likely to cause great bodily injury, based on "defendant turning on the gas stove telling [the victim] that he wanted to blow them both up," — guilty.
 Count four, terrorist threats — guilty.
 Count five, false imprisonment — guilty of attempted false imprisonment.
 DISCUSSION I. No Substantial Evidence of Felony Assault Defendant contends no substantial evidence supports his conviction of assault by force likely to cause great bodily injury, because there was no substantial evidence he had the "present ability" to ignite oven gas. We agree.
 "We review the whole record in a light most favorable to the judgment to determine whether it contains substantial evidence, i.e., evidence that is credible and of solid value, from which a rational trier of fact could find beyond a reasonable doubt that the accused committed the offense." (In re Ryan D. (2002) 100 Cal.App.4th 854, 859 [123 Cal.Rptr.2d 193]; see People v. Barnes (1986) 42 Cal.3d 284, 303-304
[228 Cal.Rptr. 228, 721 P.2d 110].) The evidence must be of "ponderable legal significance . . . reasonable in nature, credible, and of solid value." (Estate of Teed (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54], quoted with approval in People v. Johnson (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) *Page 1202 
 "`An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (§ 240.) Assault requires the willful commission of an act that by its nature will probably and directly result in injury to another (i.e., a battery), and with knowledge of the facts sufficient to establish that the act by its nature will probably and directly result in such injury." (People v.Miceli (2002) 104 Cal.App.4th 256, 269 [127 Cal.Rptr.2d 888].)
 Many cases have addressed what is or is not a "present ability" on different facts, and the California Supreme Court recently granted review of a case from this court on the correct application of "present ability" in the context of the use of a firearm. (People v. Chance (2006)141 Cal.App.4th 618 [46 Cal.Rptr.3d 235], review granted Nov. 1, 2006, S145458.)
 It is generally the rule that when a defendant points a loaded gun at the ground or away from a victim, he still may have the "present ability" to cause injury. (People v. McMakin (1857) 8 Cal. 547, 548-549 ["when the party draws the weapon, although he does not directly point it at the other, but holds it in such a position as enables him to use it before the other party could defend himself (italics added), jury could find assault]; People v. Thompson (1949) 93 Cal.App.2d 780, 782 [209 P.2d 819].) Also, where a victim ducks or flees to a place of safety before the defendant can fire his gun, he still has the "present ability" to cause injury. (People v. Raviart (2001) 93 Cal.App.4th 258, 267 [112 Cal.Rptr.2d 850] [peace officer dived for cover as defendant pointed gun]; People v. Hunter (1925) 71 Cal.App. 315, 319 [235 P. 67] ["He was endeavoring to take the gun from his sock when his wife thwarted the attempt to kill her by jumping out of the window. Naturally she did not wait to see whether he succeeded in getting hold of the gun or whether he pointed it at her, and it is immaterial whether he did either."].)
 In People v. Valdez (1985) 175 Cal.App.3d 103 [220 Cal.Rptr. 538] (Valdez), Valdez fired bullets at a person protected by bulletproof glass. Valdez reviewed a number of authorities discussing the subject of "present ability" and stated as follows:
 "This would be an easier case if California had followed the many jurisdictions which have moved to what Perkins characterizes as the `logical position' on the definition of the present ability element of assault. [Citation.] Under this modern view, the element of `present ability' is defined by a subjective test — did the defendant or his intended victim believe he had the ability to inflict injury at the time he made his attempt. In these jurisdictions, either by express statutory language or judicial interpretation, this element has come to require only an `apparent present ability' instead of objective present ability. . . . *Page 1203 "California, on the other hand, has been committed to an `old-fashioned' version of criminal assault for at least 93 years. The three essential elements — including `present ability' — have remained unchanged since the original statute was enacted in 1856 . . . [¶] . . . [¶]
 ". . . California courts have held attempting to shoot someone with an unloaded gun does not constitute the crime of assault because the perpetrator lacks the `present ability' to inflict injury. [Citations.] Nor, obviously does threatening someone with a toy gun or candy pistol satisfy this element. [Citation.] On the other hand, a defendant has been held to have a present ability to injure where he is only a moment away from being able to fire his gun." (Valdez, supra,175 Cal.App.3d at pp. 110-111.) "The real function of this `present ability' element in common law assault as incorporated in the California statute is to require the perpetrator to have gone beyond the minimal steps involved in an attempt. That is, he must have come closer to inflicting injury than he would have to in order to satisfy the elements of an attempt. . . .
 "Thus, because of the `present ability' element of the offense, to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim. . . . The policy justification is apparent. When someone has gone this far he is a greater and more imminent threat to his victim and to the public peace than if he is at an earlier stage of an attempted crime. In contrast, a defendant can be found guilty of an ordinary attempt even if intercepted on his way to a location which would be within striking distance of his intended victim [citation] or while assembling the means to attack this target [citation].
 "Nothing suggests this `present ability' element was incorporated into the common law to excuse defendants from the crime of assault where they have acquired the means to inflict serious injury and positioned themselves within striking distance merely because, unknown to them, external circumstances doom their attack to failure. This proposition would make even less sense where a defendant has actually launched his attack — as in the present case — but failed only because of some unforeseen circumstance which made success impossible. Nor have we found any cases under the California law which compel this result. The decisions holding a defendant lacks `present ability' when he tries to shoot someone with an unloaded gun or a toy pistol do not support any such proposition. In those situations, the defendant has simply failed toequip himself with the personal means to inflict serious injury even ifhe thought he had. [Italics added.] *Page 1204 
 "In the instant case, [Valdez] clearly equipped himself with the means to inflict serious injury. Not only was the gun loaded, it proved fully operational when [Valdez] fired off three rounds in the direction of the victim. . . .
 "Once a defendant has attained the means and location to strike immediately he has the `present ability to injure.'" (Valdez, supra,175 Cal.App.3d at pp. 112-113; see People v. Licas (2007) 41 Cal.4th 362,366-367, 370 [60 Cal.Rptr.3d 31, 159 P.3d 507] (Licas) [approvingValdez; "a necessary requirement of `present ability' is the attainment
of the means and location to strike immediately"].)
 In this case, there is no evidence that defendant "equip [ped] himself with the personal means to inflict serious injury even if he thought he had" (Valdez, supra, 175 Cal.App.3d at p. 112) or "attained the means . . . to strike immediately" (Licas, supra, 41 Cal.4th at p. 370). We recognize that in some sense the ventilation of the trailer may be characterized as an "environmental" or "external" or "unforeseen" element that rendered defendant impotent. But unlike in Valdez, where shooting a firearm at someone is inherently deadly, there is no evidence that the gas here was ever dangerous in any way.
 The victim was able to smell gas. We presume it was flammable gas of a type commonly used in ovens or stoves, such as natural gas or propane, though the People did not introduce any evidence about the type of gas. The victim also testified the trailer was so well ventilated that the gas did not ignite even when defendant tried to do so. There is no evidence the gas was ever a danger to the victim, even if defendant may have thought it was and may have wanted to use it to cause the victim injury. This case is more like a toy or unloaded gun case: If a defendant was not going to use the toy gun or unloaded gun as a bludgeon, and did not know the gun was a toy or was unloaded, his ignorance would not make the gun dangerous, that is, it would not give him the "present ability" to cause harm even if he wanted to shoot someone. (See People v. Orr (1974)43 Cal.App.3d 666, 672 [117 Cal.Rptr. 738]; People v. Ranson (1974)40 Cal.App.3d 317, 321 [114 Cal.Rptr. 874]; People v. Montgomery
(1911) 15 Cal.App. 315, 316 [114 P. 792].)
 The Attorney General asserts, "The mobile home is only 10 feet by 54 feet, and so it obviously would not take long before the concentration of gas inside became significant." We see nothing obvious about such conclusion, on these facts. The Attorney General correctly states that juries are presumed to understand "basic science" without expert testimony. (E.g., People v. Stitely (2005) 35 Cal.4th 514, 550 [26 Cal.Rptr.3d 1, 108 P.3d 182] [effects of alcohol].) The Attorney General continues: "The effect of alcohol on the body is a matter of basic science just like the effect of striking a lighter near gas. Both are matters of common knowledge, and thus expert testimony should not be required to prove either event." *Page 1205 
 We accept the premise that jurors will know how gas ovens or stoves work, because many people use them, either in their homes or while camping, and the fact that a lighter can ignite oven gas is "basic science" as the Attorney General asserts. It is also reasonably well known that such gases are odorized so that people will be able to detect a leak or buildup of gas. (See Abraham v. Great Western Energy, LLC
(2004) 2004 WY 145 [101 P.3d 446] [alleged improper propane odorization]; Annot. (1976) 70 A.L.R.3d 1076 [failure to odorize natural gas]; Annot. (1972) 41 A.L.R.3d 782, § 8 [failure to odorize other gases, including propane]; see Hilson v. Pacific G. E. Co. (1933)131 Cal.App. 427 [21 P.2d 662].)
 But "basic science" does not extend so far as to allow us to assume that striking a match or lighter in a room where unknown gas in an unknown concentration is present will likely light the gas, far less that the jury would understand the mechanics of combustion at this level of detail.
 The Attorney General relies on very old cases that involve the admissibility or probative value of expert testimony on the origin of fires. One cited case states the proposition that expert testimony ordinarily should not be admitted in fire cases because the trial court or jury is better equipped to determine the origin of a fire. (St. PaulF. etc. Co. v. Southern Pac. Co. (1916) 30 Cal.App. 140, 142-143 [157 P. 247].) That case has been rejected on this point by a California Supreme Court case cited — but apparently misunderstood — by the Attorney General. (George v. Bekins Van Storage Co. (1949) 33 Cal.2d 834, 843-844
[205 P.2d 1037]; see Manney v. Housing Authority (1947)79 Cal.App.2d 453, 459 [180 P.2d 69] (Manney).) Later cases make it clear that whether expert testimony on the origin of a fire is admissible depends on the facts. (See, e.g., People v. Maas (1956)145 Cal.App.2d 69, 75-76 [301 P.2d 894]; People v. Freeman (1951)107 Cal.App.2d 44, 53 [236 P.2d 396].) Further, the cases cited by the Attorney General predate the adoption of the Evidence Code, which allows the introduction of expert opinions "Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Whether the cause of a particular fire is "beyond common experience" depends on the facts: "The cause of some fires may be so simple as to fall within the common experience of any juror. If that is true the evidence of experts is unnecessary to assist the jury. To give a simple illustration any juror knows from his own experience that the application of a lighted match to dry grass will cause a fire. The cause of other fires may be so foreign to the common experience of the ordinary juror that he cannot know without the aid of expert testimony whether a fire might be expected to result or not. For example whether the combination of two chemical products would result in combustion. In the latter case only the evidence of experienced and trained chemists might enable the jury to arrive at the correct conclusion." (Manney, supra, 79 Cal.App.2d at p. 460; cf.Fireman's Fund Ins. Co. v. Romero (1954) *Page 1206 128 Cal.App.2d 331, 339 [275 P.2d 83] [whether smoking in bed caused fire did not require expert testimony].)
 Indeed, we have upheld the admission of expert testimony about the cause of fire in a criminal case. (People v. Sundlee (1977)70 Cal.App.3d 477, 484-485 [138 Cal.Rptr. 834]; see also Annot. (2001) 85 A.L.R.5th 187.) The Attorney General's view that experts cannot testify about the causes of fires is not correct. The question here is not whether the People could have called an expert, but whether, on these facts, it had to call an expert.
 The People did not have to use an expert if other evidence established that defendant had the present ability to ignite a fire and thereby injure the victim. For example, if defendant had poured gasoline on the victim, we would not hesitate to affirm, because the degree of flammability of gasoline is within common understanding. But in this case, absent any evidence other than the fact the victim could smell gas, there is no evidence it was sufficiently volatile or concentrated to ignite. The only evidence on that point is that it did not ignite whendefendant tried. There is no substantial evidence that defendant "attained the means and location to strike immediately." (Licas, supra,41 Cal.4th at pp. 366-367, 370.)
 We conclude no substantial evidence supports the verdict on count three, assault with a deadly weapon.
 II. Conviction for an Included Offense Defendant contends he should not have been convicted of both misdemeanor assault (count one) and felony assault by means likely to cause great bodily injury (count three).
 First, we reverse count three, so the claim is moot.
 Second, although we agree that convictions included within greater convictions cannot stand (People v. Pearson (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595]), that principle does not apply here. Count one charged assault with a deadly weapon based on defendant's act of placing a plastic bag over the victim's head. The jury convicted defendant of the included charge of simple assault for count one. Count three charged assault by means likely to cause great bodily injury, and in support the prosecutor elected defendant's act of attempting to ignite the oven gas. Thus, the counts were not based on the same acts and count one is not included within count three.
 Third, we reject defendant's view that the jury's verdict of misdemeanor — rather than felony — assault in count one has any relevance. The fact *Page 1207 the jury may have shown lenity (or, as the trial court said, "gave him a gift") does not change our mode of review. Acquittals or convictions on lesser charges do not affect other counts. (Pen. Code, § 954; see Peoplev. Johnson (2006) 142 Cal.App.4th 776, 788 [48 Cal.Rptr.3d 439];People v. Pahl (1991) 226 Cal.App.3d 1651, 1656-1657 [277 Cal.Rptr. 656].) Therefore, we reject defendant's claim that "any application of force used to support the simple assault conviction in count [one] is part of the factual basis of the felony assault conviction in count [three]."
 III. Substantial Evidence of Terrorist Threats Defendant contends no substantial evidence supports his conviction on count four, terrorist threats.
 We reject this claim.
 First, defendant explicitly links this claim to his claim that no substantial evidence supports count three: "Appellant contends he may not properly be convicted of making a criminal threat if the conviction for assault by means likely to produce great bodily injury is upheld." Our reversal of count three would seem to undermine this aspect of his claim. In any event, this claim is based on the incorrect premise that if a threat was part of the proof of the felony assault, it could not also be used to support the threat count. The threat to blow up the trailer was not an element of the felony assault count, and in any event defendant made many threats to kill the victim that night, not only the one about blowing up the trailer.
 Second, defendant also claims "he did not make a threat when he said he was going to kill [the victim], but instead made a statement of fact which supported the assault conviction but did not support the criminal-threat conviction." "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant `willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat `with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat — which may be `made verbally, in writing, or by means of an electronic communication device' — was `on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened `to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was `reasonabl[e]' under the circumstances." (People v. Toledo (2001)26 Cal.4th 221, 227-228 [109 Cal.Rptr.2d 315, 26 P.3d 1051].) *Page 1208 
 Defendant repeatedly threatened to kill the victim, when he put the bag over her head, when he threatened to light the oven gas, when he held a knife to her throat, when he put a noose around her neck and when he covered her head with duct tape. We reject the claim that there is no evidence of a threat.
 IV. Unanimity Instruction Defendant contends the trial court should have instructed the jury that it had to decide unanimously on the act or acts supporting count four, terrorist threats.
 "Where the jury receives evidence of more than one factual basis for a conviction, the prosecution must select one act to prove the offense, or the court must instruct the jury that it must unanimously agree on one particular act as the offense. [Citations.] A unanimity instruction is not required if the evidence shows one criminal act or multiple acts in a continuous course of conduct." (People v. Jantz (2006)137 Cal.App.4th 1283, 1292 [40 Cal.Rptr.3d 875] (Jantz).)
 "The `continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (People v.Stankewitz (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].)
 In this case the People proved defendant made a continuous series of threats throughout the victim's ordeal; "they were similar and relatively contemporaneous in time, and the parties did not make any significant distinction between them." (Jantz, supra, 137 Cal.App.4th at p. 1293.) There was no reasonable possibility some jurors would believe one discrete threat and others would believe another threat. The defense was that no threats had been made and the verdicts show that the jury rejected this version of the evidence.
 Defendant relies on People v. Melhado (1998) 60 Cal.App.4th 1529 [70 Cal.Rptr.2d 878] (Melhado). Melhado had trouble paying his car repair bill and became angry at the victim, the repair shop owner. On the morning he learned that his car had been put into storage, he told the victim he would "`blow you away'" and would get a grenade (the "9 a.m. event"). Melhado left the shop and the victim called the police. After the police left, Melhado returned, showed a grenade, and repeated his threats, frightening the victim and some employees (the "11 a.m. event"). After Melhado left, the police came again and left again. Still later that day, Melhado came to the shop again, and he was arrested (the "4 p.m. event"). (Id. at pp. 1532-1534.) *Page 1209 
 The prosecutor in Melhado advised the court that he was basing liability for terrorist threats on the "11 a.m. event," and only mentioned the other events to show the seriousness of Melhado's threat and the reasonableness of the fear it induced. However, the jury was never told of this election. (Melhado, supra,60 Cal.App.4th at pp. 1535-1536.) After concluding the "9 a.m. event" was sufficient to establish liability, the court held without significant analysis that "we cannot say that, beyond a reasonable doubt, each of the 12 jurors agreed unanimously . . ." on the same event. (Id. at p. 1539.)
 Melhado, supra, 60 Cal.App.4th 1529 is factually unlike this case. Melhado uttered threats at the repair shop, left, and returned a couple of hours later and uttered further threats. Thus, there were two distinct episodes of threats. Here, in contrast, the victim was held in the trailer for hours while the defendant continuously threatened to kill her, while placing a plastic bag over her head, threatening to light oven gas, placing a knife to her throat, placing a noose over her neck and covering her head with duct tape. Thus, assuming the Melhado decision is correct on its facts, it has no application to these facts.
 V. Sentencing Claims Defendant contends that the sentences for simple assault (count one) and terrorist threats (count four) should have been stayed under section 654. Defendant also contends that, under Cunningham v. California (2007)549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], the jury should have determined whether section 654 applied. Because we reverse count three, defendant is entitled to a new sentencing hearing, therefore defendant's claims arguably are no longer ripe. However, we explain why they lack merit.
 A. Section 654, Simpliciter Section 654, subdivision (a) provides in part:
 "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.
 "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (Neal v. State of California
(1960) 55 Cal.2d 11, 19 *Page 1210 [9 Cal.Rptr. 607, 357 P.2d 839]; see People v. Latimer (1993)5 Cal.4th 1203, 1216 [23 Cal.Rptr.2d 144, 858 P.2d 611].)
 The trial court designated count three, felony assault, as the base term, and imposed the midterm of three years therefor. For count one, misdemeanor assault, the trial court imposed a 180-day jail sentence, reducing defendant's custody credits by that amount. For purposes of this appeal we accept defendant's view that this made the sentence "consecutive." For count four, terrorist threats, the trial court imposed a one-third midterm consecutive sentence of eight months. For count five, attempted false imprisonment, the trial court imposed and stayed a midterm one-year sentence.
 Defendant contends both counts one and four should have been stayed because they "were committed during a course of conduct indivisible in time" from the felony assault in count three. We disagree. What matters for section 654 purposes is the intent and objective of the actor, not the temporal relationship between crimes, although closeness in time may inform as to the actor's intent and objective.
 Throughout the event, defendant threatened to kill the victim (count four). He also took discrete steps to harm her, such as by trying to suffocate her (count one) and trying to blow her up (count three). The fact he threatened to kill her and also took steps which, but for happenstance, might have killed her, does not mean all of his actions had one and only one objective.
 People v. Harrison (1989) 48 Cal.3d 321 [256 Cal.Rptr. 401,768 P.2d 1078], held that each sexual act may be separately punishable, even if the defendant may be said to have the common objective of sexual gratification as to all counts. (Id. at pp. 335-338.) That holding has been extended by other cases to acts of nonsexual violence. (People v.Kwok (1998) 63 Cal.App.4th 1236, 1253-1257 [75 Cal.Rptr.2d 40];People v. Surdi (1995) 35 Cal.App.4th 685, 688-690 [41 Cal.Rptr.2d 314]; People v. Trotter (1992) 7 Cal.App.4th 363,366-368 [8 Cal.Rptr.2d 648].) We follow those cases.
 B. Section 654, Cunningham The gist of Cunningham is as follows: "California's determinate sentencing law (DSL) assigns to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated `upper term' sentence. . . . The question presented is whether the DSL, by placing sentence-elevating factfinding within the judge's province, violates a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments. We hold that it does." (Cunningham, supra,549 U.S. at p. ___ [166 L.Ed.2d at p. 864].) *Page 1211 The California Supreme Court has held that the decision to imposeconsecutive sentences under section 669 does not violate Cunningham: "The determination whether two or more sentences should be served [consecutively] is a `sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not `implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.'" (People v. Black (2007)41 Cal.4th 799, 823 [62 Cal.Rptr.3d 569, 161 P.3d 1130].) While the decision to run a sentence consecutively is distinct from a section 654 decision, the reasoning of Black regarding section 669 precludes a different result as to section 654: A section 654 finding does not increase the maximum statutory penalty for the particular crimes. (SeePeople v. Retanan (2007) 154 Cal.App.4th 1219, 1229-1230 [65 Cal.Rptr.3d 177]; People v. Cleveland (2001) 87 Cal.App.4th 263,270-271 [104 Cal.Rptr.2d 641].) Further, in People v. Black (2005)35 Cal.4th 1238, 1263-1264 [29 Cal.Rptr.3d 740, 113 P.3d 534] (Black I), the California Supreme Court concluded that a section 654 decision did not require a jury trial. Although other portions of Black I were undermined by Cunningham, this portion was not addressed by the United States Supreme Court. We must follow existing California Supreme Court precedent. (See Auto Equity Sales, Inc. v. Superior Court (1962)57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)
 DISPOSITION The conviction on count three for felony assault is reversed and the cause is remanded for resentencing. In all other respects, the judgment is affirmed.
 Sims, Acting P. J., concurred.